Defendant-appellant, Kevin Dunning, appeals his conviction in the Brown County Court of Common Pleas for rape.
Dunning lived with his girlfriend, Cathy Roberts, in her home in Fayetteville, Brown County, Ohio. Cathy was a caretaker for Loretta Boyd, a sixty-year-old woman suffering from Huntington's Chorea Disease ("Huntington's"). Loretta lived in Ripley, Ohio, where she was assisted by a live-in caregiver. Loretta's daughter, Malena Caudill, paid for Loretta's home and care. On the days when Roberts cared for Loretta, Roberts would pick her up in Ripley and take her to Fayetteville. Although Dunning did not see or interact extensively with Loretta due to his work schedule, he was at Roberts' home numerous times when Loretta was there, for up to a few hours at a time.
Huntington's is a genetic degenerative neurological disease. It usually manifests itself between the ages of thirty-five and forty years old. Over time, the victim loses control of his or her muscles, resulting in facial spasms, impaired speech, and difficulty in swallowing, as well as spontaneous movement of the body's extremities. Because of the speech impairment, an interpreter, usually someone who interacts with the sufferer extensively, is needed to communicate. The problems in swallowing are remedied by placing a tube down to the person's stomach to feed liquid nutrition. There is also a loss of bodily functions requiring the use of adult diapers.
The mental effects of Huntington's are severe. In the early stages of the disease, its victims may suffer from delusions caused by the trauma of their growing physical incapacity. In later stages, the disease causes dementia, a loss of cognitive coherence, and disruptions in short-term memory. The victim cannot formulate concrete thoughts requiring more than basic thinking. Many Huntington's sufferers commit suicide before this point, mostly due to psychiatric disruptions arising out of frustration, social stigmatization, and severe depression. For those who do not, Huntington's eventually results in death as the disease increases the risk of infection.
Loretta's present treating physician, Dr. Guillermo Avecilla, began seeing her in 1998, and her deterioration has progressed, both physically and mentally, since then. Medication has helped to control or lessen Loretta's muscular disorders, but there is nothing to alleviate her increasing dementia. In Dr. Avecilla's opinion, Loretta does not have the mental capacity to consent to sex or medical treatment. He believes that she cannot accurately perceive or relate facts beyond simple answers because her judgment is impaired by the disease and because of her speech difficulties. Dr. Avecilla does believe that, with the help of a family member, Loretta can respond to basic questions when he treats her.
On September 21, 1999, Roberts and Dunning were on the verge of ending their relationship. Dunning wanted to use Roberts' car, but she refused. Roberts picked up Loretta that morning, and returned home to Fayetteville. Roberts also brought Loretta's dog to Fayetteville that day. Dunning went to a bar down the street and began drinking. He was there for more than five hours. At about 7:00 p.m., Dunning called Roberts from the bar. Roberts left and went to the bar where she and Dunning argued. Roberts left a friend, Matthew Landock, to watch over Loretta. At the bar, Roberts demanded that Dunning pack his things and leave. Dunning left the bar to collect his things, and Roberts stayed at the bar for about fifteen minutes to give him time to leave.
When Roberts returned home, she could hear Loretta's dog barking. Landock was in the living room. Roberts walked to her bedroom where she found the door almost closed. She opened the door and saw Dunning on the bed with Loretta. Dunning's pants were around his ankles, and Loretta had on her blouse, but one leg was pulled out of her sweat pants and her diaper was off. Loretta was lying on her back with her legs in the air. Dunning was on his knees, holding up Loretta's legs and making "sexual movements."
Roberts ran into the room, grabbed Dunning by the head, and pulled him off Loretta. Roberts began screaming at and hitting Dunning. Dunning pulled up his pants and left the house. On his way out of the house, Dunning passed by Landock, saying, "She wanted it." Two of Dunning's friends were waiting for him in a truck outside the house. He got into the truck, and they drove away.
Meanwhile, Roberts attended to Loretta. After Dunning left the bedroom, Roberts helped Loretta get dressed. Loretta said to Roberts, "Rape me, call Malena [Caudill]." Roberts did so, and Caudill instructed Roberts to return Loretta to Ripley. Roberts took Loretta to Ripley, and Caudill immediately took Loretta to the emergency room.
The police were notified of what happened. On September 24, 1999, Investigator Robert Gifford of the Brown County Prosecutor's Office questioned Dunning at the Clermont County Jail. Dunning was being held for driving under the influence and a probation violation. Dunning admitted to having sex with Loretta, but he maintained that it had been consensual. Dunning's interrogation was videotaped.
Dunning was indicted on two counts of rape. Count One alleged that Dunning had sex with a person whose "ability to resist or consent is substantially impaired," in violation of R.C. 2907.02(A)-(1)(c). Count Two alleged forcible rape, in violation of R.C. 2907.07(A)(2). Both charges were felonies of the first degree. Dunning filed a motion to suppress his statement to Investigator Gifford, which was denied, and a motion challenging Loretta's competency to testify.
Prior to trial, the trial court held a hearing on Loretta's competency to testify. The trial court found Loretta competent to testify, and the case proceeded to a jury trial. The state presented Malena, Roberts, Landock, Dr. Avecilla, Investigator Gifford, and Loretta as witnesses. Malena, Roberts, and Dr. Avecilla testified that Loretta was incapable of consenting to sexual intercourse. They also testified that her condition was readily apparent. Landock testified that it was clear that there was something additionally wrong with Loretta after the date of the alleged offense. The audio portion of Dunning's interrogation was played for the jury.
Loretta's testimony was videotaped per court order, and the videotape was provided to jury during its deliberations. The trial court allowed Loretta to testify for the limited purpose of allowing the jury to determine whether she was capable of consenting to sexual intercourse with Dunning. At the close of the state's case, Dunning made a motion for acquittal. The trial court granted the motion as to Count Two, forcible rape, but denied the motion as to Count One, sex with a person incapable of consenting. The jury found Dunning guilty on Count One. A sexual predator and sentencing hearing was held at which Dunning was adjudicated a sexual predator and ordered to serve a ten year prison term. Dunning appeals, raising a single assignment of error:
 THE TRIAL COURT ERRED IN FINDING LORETTA BOYD COMPETENT TO TESTIFY.
Dunning contends that Loretta should not have been allowed to testify even for the limited purpose of the jury determining if she was capable of consenting to sexual intercourse. Dunning argues that it was clear that Loretta was incompetent as a witness and that the trial court incorrectly allowed the jury to determine her competence to testify.
The competency of a witness to testify is governed by Evid.R. 601:
Every person is competent to be a witness except:
 (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of fact and transactions respecting which they are examined, or of relating them truly.
Competency under Evid.R. 601(A) contemplates several characteristics, broken down into three elements:
 First, the individual must have the ability to receive accurate impressions of fact. Second, the individual must be able to accurately recollect those impressions. Third, the individual must be able to relate those impressions truthfully.
State v. Said (1994), 71 Ohio St.3d 473, 476, motion for reconsideration granted (1995), 71 Ohio St.3d 1467, motion for reconsideration dismissed (1996), 74 Ohio St.3d 1282, citing 2 Wigmore on Evidence (Chadbourn Rev. 1979) 712-713, Section 506. Being of unsound mind does not automatically render a witness incompetent to testify. State v. Bradley (1989),42 Ohio St.3d 136, 140, certiorari denied (1990), 497 U.S. 1011,110 S.Ct. 3258, rehearing denied, 497 U.S. 1050, 111 S.Ct. 13. The general rule is that
 [a] person, who is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates and understands the nature and obligation of an oath, is a competent witness notwithstanding some unsoundness of mind.
State v. Wildman (1945), 145 Ohio St. 379, paragraph three of the syllabus. See, also, Bradley, 42 Ohio St.3d at 140-141. Even if a witness has been judicially declared mentally incompetent on a previous occasion, that witness may still be found competent to testify for purposes of the current proceeding. Id.
The determination of a witness' competency is a matter left to the trial court:
 The competency of an insane person to testify as a witness lies in the discretion of the trial judge and a reviewing court will not disturb the ruling thereon where there is no abuse of discretion.
Wildman, 145 Ohio St. at paragraph two of the syllabus; Bradley,42 Ohio St.3d at 141; State v. Allen (1990), 36 Ohio App.3d 366, 370, [69 Ohio App.3d 366, 370] jurisdictional motion overruled (1991),57 Ohio St.3d 720. This standard recognizes that it is the trial judge who is in the best position to determine issues relating to witness competency:
 We [the reviewing court] have not seen or heard the witnesses. We are confined solely to the record itself. Absent a clear-cut abuse of discretion, we are reluctant to second-guess the evaluation of a witness' competency made by the trial judge, who has spoken to the witness and evaluated his demeanor. * * * "[T]he trial judge, who saw the [witnesses] and heard their testimony and passed on their competency, was in a far better position to judge their competency than is this court, which only reads their testimony from the record." * * * A trial judge, being in the best position to view and hear a witness and being in the best position to determine the witness' understanding of the events in question and his understanding of the nature of an oath, is to be given wide discretion in determining * * * competence to testify.
Bradley, 42 Ohio St.3d at 141, quoting Barnett v. State (1922),104 Ohio St. 298, 301.
We recognize that the trial court was presented a difficult determination regarding whether Loretta, who suffers from Huntington's, was competent to testify. However, we are compelled to conclude that the trial court abused its discretion by finding Loretta competent to testify. This conclusion is based upon the fact that Loretta's testimony at the competency hearing cannot be said to demonstrate any coherence or ability to truly relate impressions. Loretta's lack of competence to testify was confirmed at trial by Dr. Avecilla, who testified that Loretta was suffering from the mental degeneration associated with Huntington's such that he could treat her only with the aid of a family member. It was also confirmed by Loretta's trial testimony, which again demonstrated the extent to which Huntington's was affecting her. The transcript of the competency hearing reads as follows:
 Q.Mrs. Boyd, I'm Judge Stapleton. How are you today?
A. (Inaudible.)
 Q. Now, I'm going to ask you a few questions, Mrs. Boyd, and I understand you're having some problems. Can you tell me your full name?
A. (Inaudible.) Boyd.
Q. And how old are you, Mrs. Boyd?
A. Fifty.
Q. And where do you live, ma'am?
A. I live in (inaudible).
MS. CAUDILL: You want — Ripley.
Q. You live in Ripley?
A. Yeah.
Q. Do you live with your family in Ripley?
A. Yeah, family and —
 MS. CAUDILL: No, she lives with a lady that takes care of her.
Q. You live in sort of a nursing home; is that right?
A. No.
MS. CAUDILL: No, it's just an apartment with —
Q. A caretaker?
MS. CAUDILL: Uh-huh.
Q. What is your caretaker's name?
A. (Inaudible.)
MS. CAUDILL: Sandy.
A. Sandy.
 Q. And how old is Sandy? Do you know how old Sandy is?
A. Yeah. She's old.
 MS. CAUDILL: Just tell me when you want me to answer?
THE COURT: She can answer at any time.
 Q. You can answer at any time, okay? Now, let me ask you this, do you have any brothers and sisters?
A. Yeah. I've got Jerry, Jr., —
MS. CAUDILL: That's her kids.
Q. Do you have children?
A. Yeah.
Q. What are your children's names?
A. Jerry, Jr., (inaudible), and Wayne and Gretchen.
Q. All right. Now, do you know what you're here for?
A. Grand Jury.
 Q. Well, no, this isn't a Grand Jury. This is — come Monday there's going to be a trial.
A. Okay.
 Q. And you're going to have to testify. Do you understand that?
A. Yeah.
Q. And can you testify as to what happened back in —
THE COURT: When did this happened? [sic]
MR. GRENNAN: September 21st, Your Honor.
Q. — September 21st?
A. Yeah.
Q. Do you know Mr. Dunning over there?
A. Yeah.
 THE COURT: I'm going to let her testify. She's competent, as far as I'm concerned. Have you got any questions? Under the circumstances, go ahead.
 MR. MILLER: Yes, ma'am. Or, yes, sir. I apologize, Judge.
CROSS-EXAMINATION
BY MR. MILLER [Defense Counsel]:
 Q. Ma'am, would you tell us, how many children do you have?
A. Eight.
Q. And do you recollect their names?
A. (Inaudible), Sharon, your name.
MS. CAUDILL: My name, Malena.
THE COURT: Any other questions?
 MR. MILLER: I don't think that question has been answered yet.
 THE COURT: She answered. She's having a verbal problem, but she understands the questions, I think.
 MR. MILLER: But I believe the test of competency is to receive information.
 THE COURT: Well, she's perceived who she is. She's perceived where she lives. She knows the Defendant in this case. She's perceived her children. She has a problem with verbally expressing it, but I think she could —
 MR. MILLER: A problem relating it, and that's the third element of competency.
 THE COURT: Well, she relates her age. She relates who she is. She relates she lives in Ripley. Isn't that related to competency? I'm going to let her testify.
 MR. BENINTENDI [Defense Counsel]: Well, the daughter was interpreting, essentially, what she was saying.
 THE COURT: Well, the jury can determine this. I think, under the circumstances, I'll let her testify. Thank you, ma'am, you can go.
(Witness excused.)
THE COURT: Is there anything further, Counsel?
 MR. MILLER: Just for the record I would ask to note my objection to the determination of the competency of the woman.
 THE COURT: All right. I'm going to put on the record the Court asked the lady her name, her age, where she lives, whether she knew the Defendant, whether — and I believe she can — she has trouble verbally expressing herself, but she understood the nature of the Court's questions and she tried to respond. And I'm going to find that she's competent to testify. All right. What else have we got today?
MR. GRENNAN: That's it, Your Honor.
As to Loretta's trial testimony, the proceedings took place as follows, beginning out of the jury's presence:
 THE COURT: On the question of competency, I will allow the witness to testify, to come in and attempt to. But I think there's a serious question raised about competency and I will not allow — the daughter can stand with her, but I will not allow the daughter to interpret.
 MR. GRENNAN [Prosecutor]: I will ask that the daughter not stand by, but my victim's advocate.
 THE COURT: Okay. But there will be no interpretation because the doctor has already indicated that, you know, there's a question of competency. I'll allow her to come in because the issue has been raised that she's able to consent and so I think the jury has a right to see her. So that will be the ruling.
* * *
 MR. MILLER: For the record, we would object to her coming in to testify. I think the doctor's testimony was clear she's not a competent witness. She cannot accurately receive, recollect or relate information. Additionally, the physician indicated that her physical condition is worsened when placed in a stressful situation such as the courtroom. So what the jury will see out of her today is not an accurate depiction of her condition on or about the 21st day of September 1999.
THE COURT: Do you want to respond?
 MR. GRENNAN: Yes, Your Honor. If it please the Court, I think the doctor's testimony was that she could not handle complex thoughts but that she was able to — he could ask questions that would be answered, although a relative would interpret for him. He said he could understand her speech, but it is like a child whose parents knows what the child is saying because they're familiar with the child. Nobody else might know but and again, Your Honor, we're not asking Ms. Caudill to interpret for her and would like for her to answer for herself, and the jury can —
 THE COURT: Well, I'm allowing it in for the limited purposes that the Defense had raised, the defense was consensual sex. And I think the jury has a right to make that determination, whether this witness is capable of — the victim is capable of consenting at all or even understanding the nature of the matter, not as to testify as to the ultimate fact of this issue. We won't even get to that. I just want you to introduce her and —
MR. GRENNAN: Do you want her to sit up or down?
 THE COURT: Have her sit up, for the record, so the camera will have to be put up here so we have a record.
(Off the record.)
(The jury entered the courtroom.)
 THE COURT: Let the record show the jury is in the box.
 Ladies and gentlemen of the jury, the next witness will be Mrs. Boyd and you'll notice that there is a TV camera, I guess you'd call it, set up there which will be part of the record in this case since there is some problem with the verbal communication. The Court is going to give you a limited instruction on Mrs. Boyd's testimony. It is only for the purpose for the jury to observe Mrs. Boyd in her walking, speech habits, ability to react and understand. That's as far as this testimony is going to be allowed. Since there is the issue of consensual sex that's been raised, I'm allowing Mrs. Boyd to come into the courtroom and you can observe her in her condition and taken in light with what her doctor has said in his testimony. So bring the witness in, please.
(Mrs. Boyd entered the courtroom.)
THE COURT: Go ahead.
 MR. GRENNAN: Mrs. Boyd, would you tell me what your name is?
A. Loretta.
Q. Loretta Boyd?
A. (Inaudible)
Q. And how old are you?
A. Sixty.
Q. And do you have children?
A. Yeah.
Q. How many children?
A. Eight.
Q. How many times have you been married?
A. One, two, three, four, five.
Q. Do you see some of your children in the courtroom?
A. Yeah.
Q. How many times have you been married?
A. Where, where, where?
 Q. Do you know somebody named Kevin Boyd — excuse me, Kevin Dunning, do you know Kevin Dunning?
A. (Inaudible.)
Q. Yes?
MR. BENINTENDI: Objection, leading.
Q. Do you know Cathy Roberts?
A. (Inaudible.)
Q. Do you know Cathy Roberts?
A. Yeah.
Q. Do you know Sandy?
A. Yeah.
Q. And do you live with Sandy?
A. Yeah.
 Q. I want you, Mrs. Boyd — would you look around the courtroom and see if you see Mr. Dunning here. Look over here, too.
MR. BENINTENDI: Objection.
 THE COURT: Just swing her around there and let her look through the whole courtroom there.
 Q. Have you had a chance to look at everybody in the courtroom?
A. Yeah.
Q. Do you see him?
A. Yeah.
Q. Where is he?
A. (Inaudible.)
 Q. Okay. Do you remember Mr. Dunning doing something to you back in September?
A. Yeah.
Q. What did he do to you?
A. Raped me. (Inaudible.)
Q. Do you like Mr. Dunning?
A. (Inaudible.)
 MR. BENINTENDI: Your Honor, this is outside the scope of the limiting instruct —
THE COURT: I think it is.
MR. BENINTENDI: — and I would object.
 THE COURT: I'm going right — I'm going to cut her off right now and I'll allow them to cross-examine, Mr. Grennan.
MR. GRENNAN: Okay.
THE COURT: You may cross-examine, Counsel.
 MR. GRENNAN: I have no further questions, Your Honor.
THE COURT: You may cross-examine.
 MR. GRENNAN: Oh, yeah, I had one question, Your Honor.
THE COURT: Well, keep in mind what I told you.
MR. GRENNAN: May I approach?
(Side bar conference.)
BY MR. GRENNAN:
 Q. Mrs. Boyd, one last question. Did you consent to having sexual intercourse with Kevin Dunning on September 21?
MR. BENINTENDI: Objection.
THE COURT: Let her answer.
A. No.
Q. No further questions, Your Honor.
THE COURT: You may cross.
MR. BENINTENDI: No cross.
 THE COURT: All right. You may take her out. Watch your step. Call your next witness.
At the competency hearing, the trial court relied upon the "interpretation" of Loretta's answers by Caudill, or Caudill's answers themselves, in making its judgment that Loretta was competent to testify. This was error. It is the witness' answers and demeanor that should be considered, not those of an interpreter. This is not a case where the witness spoke a foreign language which would make an interpreter an essential participant in the proceedings. That Loretta could only communicate with the aid of someone else "interpreting" her response, or occasional lack of response, should have been an indication of Loretta's incompetence to testify. In fact, at the competency hearing, Loretta was incorrect as to with whom she lives and the proceedings for which she was present. She confused her children and siblings. Many of her answers were given after prompting or "clarification" from Caudill.
Even though the trial court erred in finding Loretta to be competent to testify, we find that, in light of the substantial evidence of Dunning's guilt, such error was harmless. Crim.R. 52(A) provides:
 Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.
Error in the admission of evidence is harmless when there is no reasonable probability that the testimony contributed to the defendant's conviction, that is, where the error is harmless beyond a reasonable doubt. State v. Lytle (1976), 48 Ohio St.2d 391, 403, vacated in part on other grounds, Lytle v. Ohio (1978), 438 U.S. 910, 98 S.Ct. 3135. Error will not contribute to the defendant's conviction when the remaining, properly admitted evidence, standing alone, constitutes overwhelming proof of the defendant's guilt. State v. Williams (1983), 6 Ohio St.3d 281,290, certiorari denied, Williams v. Ohio, 464 U.S. 1020, 104 S.Ct. 554, citing Harrington v. California (1969), 395 U.S. 250, 254,89 S.Ct. 1726, 1728.
Dunning was charged with and convicted of rape by engaging in sexual conduct with one incapable of consenting. R.C. 2907.02(A) provides:
 (1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender when any of the following applies:
* * *
 (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.
The evidence at trial clearly established that Dunning engaged in sexual conduct with Loretta. This was established through the testimony of Roberts, who saw Dunning engaged in this conduct, as well as Dunning's admission in his interrogation that he had sex with Loretta.
The state overwhelmingly demonstrated that Loretta's ability to consent was impaired by her condition. Dr. Avecilla testified extensively about the effects of Huntington's upon its sufferers and how Loretta was affected by the disease. He testified that she could not engage in complex thought processes, or even basic processes such as simple math. She could only communicate through the aid of someone "interpreting" her replies, but only after the questions were made very simple, and only if the "interpreter" was a person who extensively interacted with Loretta. Dr. Avecilla's diagnosis of the severity of Loretta's condition was confirmed by the lay testimony of Caudill, Roberts, and Landock. Although Roberts, who is Dunning's girlfriend, testified that Loretta could communicate under limited circumstances, the testimony at trial conclusively established that she was incapable of consenting to sexual conduct.
The state also proved that Dunning knew or had reason to know of Loretta's impaired condition. Dr. Avecilla described in detail Loretta's condition and how she would appear to a lay person. The lay witnesses described Loretta consistent with Dr. Avecilla's testimony. Caudill and Roberts testified that Loretta needs substantial aid with even the most simple everyday functions. She is incapable of controlling her body, and she has extreme difficulty in communicating even rudimentary thoughts and responses. Landock, who had little interaction with Loretta, testified that Loretta's disease was obvious and that while he "[didn't] believe she's retarded[, he] believed that she has a mental dysfunction." Landock testified that Loretta was "not normal." It cannot be doubted that Dunning knew or had reasonable cause to know that Loretta's ability to consent was impaired, especially where he had been around her on numerous past occasions.
Prior to Loretta taking the stand, Dr. Avecilla and Caudill testified. They described Loretta and her condition in great detail, explaining her muscular tremors and inability to effectively communicate. They described her inability to control her bodily functions and her need for tube feeding. They explained how Huntington's has affected her mental functions and that her cognitive abilities will only worsen. Dr. Avecilla testified that Loretta had been deteriorating the entire time he has treated her. He discussed Loretta's worsening dementia and that there is nothing to remedy her mental deterioration.
Therefore, Loretta's presence did not prejudice Dunning as it did nothing more than confirm the above descriptions of her condition. The trial court limited the purpose of Loretta's presence such that the jury was allowed to judge only whether she was capable of consenting to sexual conduct. The net effect of this instruction was to make Loretta not a fact witness, but an exhibit; the best evidence of her condition. Loretta was presented to the jury only after the jury had received a detailed description of her condition. Thus, in light of the limited purpose of Loretta's presence, the finding that she was competent to testify did not affect any of Dunning's substantial rights.
Loretta's testimony that Dunning raped her and that she did not consent to sexual conduct with Dunning did not prejudice Dunning. He was not convicted of forcible rape. The trial court granted his motion for acquittal as to that charge. Loretta's testimony did two things: it confirmed that she was incapable of consenting, and it presented evidence of forcible rape. The first of these was conclusively established prior to Loretta taking the stand; the second was irrelevant once the motion for acquittal on the forcible rape charge was granted.
The trial court erred by finding Loretta to be competent to testify, but that error was harmless in light of the overwhelming proof that Dunning engaged in sexual conduct with Loretta when he knew or had reason to know that she was incapable of consenting to such conduct. The assignment of error is overruled.
 ____________________________ YOUNG, J.
POWELL, P.J., and VALEN, J., concur.